In the Matter of ABRAHAM SCHLACHT, an Attorney, Respondent.

First Department, February 14, 1930.

*Isidor J. Kresel* of counsel [*E. Crosby Kindleberger* with him on the brief], for the petitioners.

*George Gordon Battle* of counsel [*Charles A. Schneider* with him on the brief; *Battle, Miller, Levy & Van Tine*, attorneys], for the respondent.

DOWLING, P. J.   The respondent was admitted to practice as an attorney and counselor at law in the State of New York on November 16, 1925, at a term of the Appellate Division of the Supreme Court of the State of New York, First Department.

This proceeding arises out of the recent " ambulance chasing " investigation.   The respondent is charged in the petition with misconduct as an attorney at law in the solicitation of negligence cases, failure to obtain orders in infancy cases, as required by section 474 of the Judiciary Law (as amd. by Laws of 1912, chap. 229), and retaining more fees than called for in orders in other cases. Respondent answered and the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon.   During the course of the hearings before the referee supplemental charges were added; these involved misconduct, in knowingly placing false addresses on summonses in many cases brought in the Municipal Court, Second District, Borough of Manhattan, with intent to deceive the court and to prevent cases from being removed to the proper districts; and in

inducing many of his former clients to testify falsely before the referee. This latter charge was made after many of the former clients of the respondent testified before the referee diametrically opposite to their former testimony before Mr. Justice WASSERVOGEL in the "ambulance chasing" investigation.

The referee has filed his report and the petitioners now move that the respondent be adjudged guilty of professional misconduct.

The report of the learned referee finds the respondent guilty of failure to obtain orders for leave to compromise and settle infants' actions, and of using incorrect addresses for plaintiffs, enabling them to have their causes brought in the Second District Municipal Court, Borough of Manhattan, instead of the districts wherein they respectively resided.

Respondent admitted that he failed to obtain compromise orders on the settlement of infants' cases. His testimony regarding his practice in such cases is as follows: " Until the inquiry was instituted, your Honor, I was under the impression that compromise orders were not necessary in cases where the settlement was between $100 and $125. Until that time I had entertained that view. That view was fortified by the fact that the heads of the legal departments of insurance companies and also leading negligence practitioners confirmed my view, with the result that I adopted the rule in my office that whenever we would have an infant's case which could be settled for $100 or $125 a compromise order would be deemed unnecessary. There was no deliberate intent on my part to ignore or to violate any provision of law. I was honest enough to tell that to Mr. Cooper because in the meantime I was unaware of an express provision that all infant cases, whenever settled, must have a compromise order for approval."

It appears, however, that in quite a number of cases, many of them involving $100 or less, respondent did obtain orders. His explanation is that the insurance companies demanded orders in those particular cases. An examination of a list of such cases discloses that in only two out of twelve was respondent allowed fifty per cent of the proceeds, although he customarily asked for fifty per cent. A further examination of the testimony on this practice leads to a conclusion that respondent's views, as to the necessity for complying with the statute, were not unrelated to his knowledge that if he applied for orders he would not only have the trouble of obtaining the orders but would probably get much less than fifty per cent provided for in the retainer, and which he always got in adult cases.

The report of the learned referee states: " As to this charge, I find that it is established by the evidence, and that the respondent

has been guilty of unethical and illegal practices in that, in numerous actions in which he was retained by the guardians of infant plaintiffs upon a contingent basis, he accepted compensation from sums received in compromise without first obtaining orders establishing the amount of such compensation."

In this finding we concur.

Regarding the charge of knowingly inserting false addresses on summonses taken out in the Second Municipal District Court in Manhattan, a stenographer formerly in the employ of respondent testified that it was her duty to prepare and file the summonses and to attend the calendar calls; that when she first obtained employment she was instructed by her predecessor that it would serve her convenience best if the summonses bore an address within the Second District Municipal Court, Borough of Manhattan, which would allow her to file the summonses and to attend the calendar calls in the said district. This witness testified that respondent did not instruct her to institute or continue such practice, and that she never discussed the matter with him. There is evidence of the use of fictitious addresses in one hundred and twenty instances. Respondent denied any personal knowledge of this practice. It appears that the address of the plaintiff was correctly shown on respondent's retainer, and, as he testified, on the statement of facts. He admitted knowledge of the provision of the Municipal Court Code which entitled defendant to have a case moved to the proper district. The following question and answer are from respondent's cross-examination: " Q. So that by giving a Second District address you prevented the defendant moving to take it out of the Second District? A. That is true, but that idea never entered my mind as to whether I could gain any advantage or not."

The report of the referee states: " The respondent testifies that he gave instructions to his staff to bring Municipal Court actions in the districts in which the plaintiffs resided and that he was wholly ignorant of the fact that fictitious addresses were inserted in these very numerous summonses. I disbelieve his testimony in that regard. I deem it highly improbable that his stenographers and clerks would have inserted fictitious addresses in summonses without his instructions, and I consider it impossible that this practice can have obtained in his small office to the extent shown by the testimony without his full knowledge and approval. * * *

" In disobeying the statutory direction to give the (true) addresses of plaintiffs, and in inserting fictitious addresses, the respondent not only disobeyed the law, but was also guilty of conduct tending

to deceive the court and his adversaries. He is guilty of the charge now under consideration,   *   *   *."

This finding of the referee is supported by the record.

On the charges of solicitation, the record discloses that respondent was admitted to practice in November, 1925, whereupon he opened an office at 150 Delancey street. His family is well known in the community. His father was active in the religious, social and communal work of the east side, and was widely known and generally respected in that part of the city. One witness testified that his brother has been identified with pretty nearly every movement that had for its object the betterment of the east side. From the time of respondent's admission, in November, 1925, to June, 1928, he appeared as attorney of record in 837 cases brought in the Municipal Court, Second District, Borough of Manhattan. Nearly all of those were cases in which liability insurance companies were involved and nearly all were settled after the filing of the summons and without trial. It does not appear that respondent ever tried a case. In the few cases that were litigated he " sat in " with counsel. He testified he refused to jeopardize his clients' interest because of his lack of experience and it was his general custom to have trial counsel.

Former clients of respondent were called before the referee. Three of these, Beeber, Cohan and Camhi, testified that they never heard of respondent before the accidents in which they were involved; following such accident a stranger, claiming to be from respondent's office, came and saw them, and as a result respondent was retained. Respondent says a restaurant keeper recommended the Beeber case to him; that Cohan knew his brother and came to him because of that; and Mrs. Camhi came to him because one Mustachi told her of respondent. Mustachi testified he saw Mrs. Camhi " on the street and she was excited and she told me that her husband met with an accident. So I asked her where is the husband. She told me up in the house. So I went up to see him and he was in a dazed condition. Mrs. Camhi told me she wanted to give the case to a lawyer. Naturally, I had Mr. Abraham Schlacht's business card with me. I am handing her this card and I said he would take care of her. That is all the conversation I had with her." Mustachi said he had had this card for three years and received it from Schlacht when he was introduced to him.

Abraham Fishman, son of Philip Fishman, testified that his father was injured at Grand and Orchard, or Allen street, and a young man took him to his home on Simpson street in the Bronx; this young man was a stranger to the family; he said he was representing respondent and asked for the case. Fishman testified:

" After this young man came to the house once or twice — I have an older brother who went to see what the man really was going to do for us. He seen the lawyer and he was to get thirty-three and a third per cent and my father the rest." He testified that he had never seen the young man before and they did not know respondent. Benjamin Fishman testified to going to see respondent and retaining him. Asked how he happened to go to respondent he answered that he had heard of respondent's office several times and when the accident happened he got a friend of his whom he told about the accident. Presumably he went to respondent's office as a result of this talk with his friend. He was also asked if his brother Abraham had told him that a clerk from respondent's office had been to their home, and he answered, " He might have. I wouldn't say he didn't. I tell you frankly I didn't pay much attention. I was not very much interested."

The testimony in the Provenzano case is based on what the elder Provenzano told his son.

The clients Schanhaus, Shaye, LaPorte, Greenspan, Fischer, Mellet, D'Amico, Kulik and Molner gave testimony in the investigation before Mr. Justice WASSERVOGEL. Samuel Schanhaus testified there that between half an hour and an hour after the accident to his son someone from a lawyer's office called and spoke to him about the case; he was asked if he knew this man, and he answered that he did not and had never met him before. The following is an extract of his testimony before Mr. Justice WASSERVOGEL: " Q. What did he say? A. He said he had got a lawyer and he wants to take the case for me. Q. Did he give you a lawyer's card? A. He did. Q. What was the name on that card? A. Mr. Schlacht or something like that. Q. Abraham Schlacht? A. Yes, sir." On the hearing before the referee herein he testified that this man was sent for by his wife. He testified that he said nothing about his wife sending for respondent before Mr. Justice WASSERVOGEL because he was not asked.

The recantation of Schanhaus is typical of what has happened in the other cases. In the LaPorte, Greenspan, Fischer, Mellet and D'Amico cases the testimony before Mr. Justice WASSERVOGEL was to the effect that policemen were active on respondent's behalf. In the LaPorte case the testimony was that LaPorte asked the policeman who had the beat at Goerck and Rivington streets for a lawyer and he referred them to Abraham Schlacht. Before the referee LaPorte testified that the policeman said he could get a lawyer anywhere on the east side and LaPorte went to respondent. LaPorte testified as follows before the referee: " When I walked on the opposite side from where Mr. Schlacht's office is now I started

to look around and seen the name Abraham Schlacht, a law office; being I know Mr. Abraham Schlacht before the time he had a law office, I didn't know since he was a lawyer, I thought I went up to see him, and we went up and gave him my case and seen it was the man I knew before, and I gave him my case." In the Greenspan case the testimony was that he asked the policeman for a good lawyer, and the policeman said he had a good lawyer. A man came with respondent's card. On cross-examination before the referee, Greenspan testified his son-in-law told him he was going to send Mr. Schlacht. Similarly, in the other cases, the line of testimony before Mr. Justice WASSERVOGEL showing solicitation was repudiated before the referee.

The referee, in his report, states: " The respondent, if condemned, must be condemned upon the testimony given in this proceeding, and all earlier conflicting *ex parte* statements of the witnesses must be wholly disregarded in considering the charges now under investigation. It is proper to add, however, that I do not think that the witnesses who had made these seemingly conflicting statements are necessarily guilty of intentional perversion of the facts, or of perjury. I think that the testimony given before me by such witnesses, when sifted by the cross-examination of counsel for the respondent, was more reliable, on the whole, than the earlier *ex parte* statements made by them, and I feel that, in the few instances where the discrepancy between the earlier statements and the present testimony is not explained, such discrepancy is attributable, rather to ignorance, misunderstanding and timidity on the part of the witness, than to intentional falsehood."

On the charges of solicitation, the referee concluded: " Viewing the testimony as a whole, I think it fails to establish, either that the respondent, in person, improperly solicited business from persons unknown to him, or employed other persons to solicit such business. There is no evidence in the record which shows, or from which it can properly be inferred, that he paid compensation to persons for bringing him business, or that he employed policemen, hospital attendants or others, to inform him of accidents. I think that the respondent, himself, his brother, Harry Schlacht, and other members of his family, caused it to be widely known that the respondent desired to obtain as much business as he could and that the respondent's neighbors and numerous friends, most of whom, as the respondent testifies, were of the same religious faith as himself, interested themselves actively, but as a matter of good will, in an endeavor to help him build up a legal practice; and that the considerable volume of legal business that came to his office was due to such activities. In my opinion the respondent

has not violated the Twenty-seventh or Twenty-eighth Canons of Professional Ethics, or Section 274 (subd. 2) of the Penal Law, and is not guilty of the charges (of solicitation)."

The record of the number of cases handled by this young and inexperienced attorney in such a short time in itself is sufficient to give support to the charges of solicitation. But that alone is not enough to convict the respondent. With the proof what it is in this proceeding we are forced to accept the conclusion of the referee.

On the charge of inducing former clients to testify falsely before the referee, the petitioners admit there is no direct evidence in support of this charge, but contend that the plain inferences sustain the charge. It is true that respondent's testimony as to the source of a number of the cases corresponds to the testimony given by clients as to how they came to place their cases with respondent. That is not, necessarily, indicative of any wrongdoing. Speaking of this charge, the referee said: " It is wholly unfounded. The record is barren of evidence supporting it, or having the slightest tendency to support it." We accept this conclusion of the referee.

The explanation given by respondent in the Cordillo case, and his explanation and the testimony of Schanhaus in the latter's case, dissipate the charge that respondent retained more than he was entitled to. The conclusion of the referee on the question of the acceptance of a fee in excess of fifty per cent is warranted by the evidence.

For respondent's misconduct in violation of section 474 of the Judiciary Law, and for his misconduct in inserting. fictitious addresses in summonses in Municipal Court actions he is suspended for the period of two years, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent suspended for two years.