In the Matter of EDWARD GORDON, an Attorney, Respondent.

First Department, April 11, 1930.

*Louis Salant* of counsel [*Isidor J. Kresel*, attorney], for the petitioners.

*John J. O'Connor* of counsel [*Joseph Sterling*, attorney], for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, First Department, on February 8, 1918.

The petition and supplemental petition charge that respondent has been guilty of misconduct as an attorney at law as follows: (1) Solicitation of personal injury cases through employees not members of the bar; (2) withholding for his fees out of settlements in infants' cases larger sums than had been allowed to him by

court orders; (3) obtaining moneys in settlement of infants' cases and retaining part thereof. for his fees without obtaining court orders fixing his fees; (4) submitting false affidavits verified by him in support of applications for leave to discontinue actions brought by him in the Supreme Court in behalf of infants; (5) submitting, in support of applications for leave to compromise infants' actions and for orders fixing his fees therein, false and misleading affidavits verified by him or by guardians *ad litem*, or by both.

Respondent answered and the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon. The learned referee has duly reported and petitioners now move for such action as this court may deem just and proper.

The record discloses that soon after respondent's admission to the bar he was enlisted in the army, the country being then at war, and was discharged therefrom about May or June, 1919. Following such discharge he left New York for Chicago, but returned to New York later in the year, and in December, 1919, opened an office for the practice of the law at 299 Broadway. He also opened an office on the east side at his father's place of business, and obtained a great deal of commercial work and a large number of negligence cases. Gradually his business became more and more negligence work. He employed investigators and knew these investigators solicited cases, but claimed he did not know at the time that the practice was illegal. His testimony on that point is as follows: " My conception of it was this, that the law abhorred employing men on a salary or giving them a compensation, or splitting fees with them for the purpose of expressly bringing any business to a lawyer, but where these men were employed in my office and they heard of a case which happened to one of their friends, relatives or people that they knew, or even a stranger in their immediate vicinity, if they went up to the home of the injured and spoke to them and learned if they wanted to retain an attorney, these employees of mine asked them to retain me, that that was not solicitation."

He knew it was a solicitation but was under the impression that it was not a solicitation which was forbidden by the law. In the brief of respondent the following statement is made: " Counsel for respondent contends that up until the discussion which arose at the time of the original motion for an investigation, a very large percentage of attorneys fully believed that it was not misconduct to permit an investigator to solicit cases. All knew it to be unlawful to pay commissions and all knew it to be unlawful to employ a layman to solicit cases; but a vast number did not know

that it was unlawful to permit a layman, employed regularly as an investigator, to solicit cases. The Court may now hold that such a case as the respondent described comes within the statute. Only jurists could determine the question; and up until the last few years, there was no adjudication applicable to the case which the respondent describes. It should appreciate that the respondent did not regard such practice as violating the spirit or intent of the law."

Further: " We do not attempt to justify solicitation. We do most earnestly urge, however, that this solicitation, not actively encouraged by the respondent, which gradually grew up in the course of his practice and which followed the legitimate employment of investigators, was less aggravated, if solicitation may be divided in degrees, than if respondent had actively and intentionally employed men for the purpose and had specifically paid or rewarded them for such efforts in his behalf."

During the course of the hearing ten investigators were mentioned. One Nicholas Ferrante, known as Richard Roberts, was the chief. The testimony of one of these investigators, Louis Moses, is illuminative of the practice followed at respondent's office. In August, 1924, " Roberts " induced him to enter respondent's employ at fifty-five dollars per week. Prior to that he was, as he described himself, an " independent chaser," soliciting cases and investigating for · an attorney named Morris D. Silverstein (Mr. Silverstein consented to an order striking his name from the roll of attorneys and counselors at law after the service upon him of a petition alleging his professional misconduct.) His remuneration was raised from time to time until it became seventy-five dollars a week and expenses, and the upkeep of the car used in connection with his work was in part paid for by respondent. In addition he received each year at Christmas, the first year, $100 and a diamond ring; the second year, $350 and a diamond ring; the third year, $750 and a Howard watch. He remained in respondent's employ until July, 1927. His " territory " ran from Water street to Houston street, and from the East river to the Hudson river. He testified, in part, as follows: " Every morning I would have to report to Mr. Roberts and get the line of investigation. * * * I would report to him what I accomplished on the day previous and I would be assigned to new work. Q. Isn't it a fact that among the new work that Roberts would assign to you, he would tell you to go to such and such an address, and such and such a person has been injured in an accident, to sign him up for a retainer? A. Sometimes he would say that and sometimes he would say, ' Say that so and so sent you there ' he would say

that to me. I said ' Who would you want me to say sent me there?' If he gave me the name, and I would go to the party injured or the member of the family and say so and so sent me and investigate the case first, and if I found there is any merits I report to my superior, Mr. Roberts. * * * Q. Isn't it also a fact that outside of getting instructions from Mr. Roberts in the morning, that Mr. Roberts would call you up during the day and say to you that an accident happened at such and such a place and the injured person or the injured child is named so and so and it lives at such and such an address — go there and sign him up? A. Yes. Q. That happened quite frequently? A. Yes."

Before Mr. Justice WASSERVOGEL, in the Ambulance Chasing Investigation, Moses testified as follows: " Mr. Roberts would call me up, or I would call Mr. Roberts in the course of my investigation, and ask him if there is anything new. He would say to me, John Brown, struck by an automobile, confined to Gouverneur Hospital, compound fracture of the leg. I would go to the. family of where John Brown lives, and I would say to Mrs. Brown or to Mr. Brown's son, or if the party happened to be an infant I would speak to the father or the mother, that I represented Mr. Gordon, Mr. Gordon specializes in the line of accident cases, and I ought to take you down to meet Mr. Gordon, you understand, meet Mr. Roberts, this case must get investigated immediately; and I tried to interest them; and that is all there is to it. I would go to the hospital with the family, you understand, visiting hours, and procuring the cases. Sometimes I would be fortunate, sometimes I would be unfortunate. I don't say I got every case down there."

Moses brought in an average of twenty-five cases a month, of which about twenty had been solicited by him. It is interesting to note that Moses claimed to have declined cases which policemen volunteered to send him, the reason being that competition had caused a rise in the sums paid for such cases. Moses testified that his prices were ten dollars on contusions and twenty-five dollars on fracture, but that a young lawyer named Abraham Schlacht had moved right opposite the police station on Delancey street and he paid fifteen dollars on contusions and fifty dollars on fractures. (Abraham Schlacht has been disciplined by this court for unprofessional conduct. See *Matter of Schlacht,* 228 App. Div. 226.) After leaving respondent's employ Moses worked for an attorney in Brooklyn named Sidney Gondelman. Gondelman has been disbarred for ambulance chasing activities (*Matter of Gondelman,* 225 App. Div. 462).

Respondent testified that in 1924 he had 150 or 200 pending negligence cases. In 1925 about 250 or 300 additional negligence

cases came into his office. In 1926, maybe 325 or 340, and in 1927, maybe 350.

This wholesale negligence business came to respondent as the result of the solicitation activities of his various "investigators." There is no justification for it. Respondent's plea that he did not think solicitation illegal unless the solicitors were expressly paid compensation for soliciting in no way lessens the offense. Petitioners concede that there is no proof that any of these solicitors were directly and specifically paid for obtaining cases. But the record establishes twenty-three specific instances of solicitation. The testimony warrants the conclusion that section 274 of the Penal Law was violated. In any event, it is clear that respondent maintained his practice in complete disregard of the Canons of Professional Ethics adopted for the profession long before his admission thereto, relative to solicitation of retainers.

On the charge that respondent disregarded court orders fixing his compensation in infants' cases and retained in such cases the percentage called for by his retainer, proof was offered of six instances where this was done. Mrs. Mary Nulty testified that her son Edward had been injured, and her husband signed a retainer giving the claim to respondent on a fifty-fifty arrangement. The father, John Nulty, was originally appointed guardian *ad litem*, but he died before the case was settled and the widow and mother, Mary Nulty, was substituted. The injury occurred in April or May, 1925, and the settlement was made in July, 1927. Mrs. Nulty consented to the settlement of the infant's action and the parent's action for $250. She received $125, being told that $75 was for the boy and $50 for herself. It appears that the order allowing compromise fixed respondent's compensation at $40, so that Mrs. Nulty should have received out of the $150 settlement of the infant's claim, $110, and, with the $50 out of the $100 settlement of her own claim, the total paid her should have been $160. Respondent, in explanation of the discrepancy, claimed he loaned John Nulty, the father, $35 on March 13, 1926, and produced a receipt alleged to have been signed by John Nulty, who died February 22, 1927. The widow admitted the signature looked like that of her husband. She testified he had never told her anything about borrowing or receiving any money from respondent; that she was not informed of the court order at the time of the settlement, and nothing was said about any loan to her husband. It is possible that respondent really loaned John Nulty $35, but the testimony of the parties as to what took place at the time of the settlement, as well as all the circumstances involved, would indicate that it is highly improbable that he did so.

Mrs. Rose De Benedetto testified that her son, Luigi, was injured in August, 1925, and respondent was retained on a fifty per cent arrangement. Eventually the infant's claim was settled for $200, and the guardian's action for $100. The court order allowing compromise of the infant's claim fixed respondent's compensation at $50. The parent and guardian should, therefore, have received $150 on the settlement of the infant's claim, and $50 on the settlement of the guardian's claim, making a total of $200. Mrs. De Benedetto received from respondent's employee $150 and was told that $150 was for her and $150 for the lawyer. Before the referee, however, . Mrs. De Benedetto testified that following her appearance before Mr. Justice WASSERVOGEL in the ambulance chasing investigation, her husband had informed her that he had received $50 from respondent. Respondent produced a receipt for $50, dated May 20, 1926, signed with an " X " mark and bearing a thumb print, and testified that he had loaned $50 to De Benedetto. De Benedetto was not produced. A handwriting expert, selected by the referee on consent of counsel, testified that the " X " mark on the receipt was not made by the same person who made the " X " mark on the father's releases or on the father's affidavit produced from the files of the court.

Mrs. Bertha Chalupsky testified that her daughter, Rose, was injured in October, 1926. Respondent was retained on a fifty per cent basis. In the early part of 1928 a settlement was arrived at, $175 in the infant's case and $75 in the parent's case. The order allowing compromise in the infant's claim fixed respondent's compensation at $62.50. There should have been paid to the plaintiffs $150, being $112.50 in the infant's case, and $37.50 in the parent's case. There was paid, however, the sum of $125. Respondent produced a receipt for $35 dated January 5, 1928, which he said covered a loan made by him to Mrs. Chalupsky when she importuned him for a loan of $50 in connection with expenses which she contemplated or had had in connection with moving her home. It is interesting to note that this $35 alleged to have been advanced, with the $125 paid at the time of settlement, totaled $160. Respondent attempts to account for this payment of more than was coming to the Chalupskys by the statement that he voluntarily reduced his percentage in the parent's case to forty per cent instead of fifty per cent. If this were so, he would have been entitled to retain in the infant's claim $62.50, as allowed by the court order, $30 (the forty per cent of the parent's claim) and $35, advance loan, making a total of $127.50, instead of the $125 which he really retained. Mrs. Chalupsky said nothing about the loan during the testimony before Mr. Justice WASSERVOGEL

in the Ambulance Chasing Investigation, claiming, "They wouldn't let me talk." Nor is any mention made of it in an affidavit made by her in connection with the investigation.

Alfred Fehrenbach, an uncle by marriage of George Kenny (both of whose parents are dead), testified that Kenny was living with him in August, 1926, when Kenny was injured. Respondent was retained on a fifty per cent arrangement, and two actions were brought. In November, 1927, the actions were settled, the infant's action for one hundred and twenty-five dollars and the guardian's action for twenty-five dollars. The order allowing compromise of the infant's claim fixed respondent's compensation at forty dollars. Fehrenbach should have received, therefore, eighty-five dollars in the infant's action, and twelve dollars and fifty cents in his own, making a total of ninety-seven dollars and fifty cents. When he called at respondent's office, he was given a check for eighty-five dollars to indorse, the man telling him that it was a mistake, the right amount was seventy-five dollars. Fehrenbach and the man from respondent's office went downstairs, and the man cashed the check at the cigar stand and handed Fehrenbach seventy-five dollars. Nothing was said about a court order allowing respondent only forty dollars in the infant's action, and Fehrenbach understood the payment was one-half of the one hundred and fifty dollars that was supposed to be the settlement. Following Fehrenbach's appearance before Mr. Justice WASSERVOGEL in the Ambulance Chasing Investigation, and some months thereafter, a man, who said he was from Gordon's office, came to him and said that George had some more coming and handed Fehrenbach some twenty-five or twenty-six dollars. Fehrenbach said: "He give me three ten dollar bills and I had to give him some change back." Fehrenbach made no inquiry but took it for granted that the money was coming to him. Respondent admits that the man who made this belated payment was his representative. Respondent's story is that during the pendency of the action Kenny called at his office on a number of occasions raggedly and insufficiently clothed, complaining bitterly of his uncle's treatment of him, of hunger and of being beaten by his uncle, and asking at one time money for clothes, another time for railroad fare to go upstate to get a job, and on another occasion to go to an aunt in Massachusetts, and respondent advanced him small sums amounting in all to some twenty-two or twenty-five dollars. Respondent claims he told Fehrenbach of these advances at the time Fehrenbach signed the affidavits in the compromise proceeding, that he expected to deduct some from the money received and that Fehrenbach made no objection. As to the eighty-five-dollar check, respondent

testified: " I left the check with the girl, with Miss Fox in the office, and told her when Mr. Fehrenbach comes in to give him the check for eighty-five dollars. I told her to remind Mr. Fehrenbach that the boy had borrowed some money. That is all the conversation, and I ordered Miss Fox to give the entire check." When he learned about Fehrenbach's testimony before Mr. Justice WASSERVOGEL he directed his office to " Send up to that man $25 or $26, whatever is coming to him." Respondent testified: " I felt even though I loaned the money to the boy for necessaries, that he was the Guardian and he was entitled to receive it, and I made a mistake in giving it to the boy, and I felt I would stand the loss and send that money back to him." No receipts or records were produced to substantiate the claim of alleged advances. Nor is any attempt made in the explanation offered to reconcile the items of payment with the items of alleged advances, nor is any consideration given to the amount due in settlement of the guardian's claim.

Mrs. Elizabeth White testified that her son Edward was injured about three years ago. Respondent was retained and they were " to go half and half." Two actions were brought, and eventually the infant's claim was settled for $300 and the parent's for $100. Mrs. White testified she received $200. The order allowing compromise fixed respondent's compensation in the infant's case at $100, so that Mrs. White should have received $200 in the infant's case and $50 in the parent's case, making a total of $250. Following her testimony before Mr. Justice WASSERVOGEL in the Ambulance Chasing Investigation, and about two months thereafter, the man who originally obtained the case for respondent came to Mrs. White and, as she testified: " He came around about three o'clock in the afternoon and he says ' How do you do, Mrs. White, how is the little boy. Now, I have good news for you.' He says ' I got some more money for you,' and I says ' Oh, that's good, thank God. I didn't expect I was going to get any more. I thought you said that was all I was going to get.' So he gave me $110 and he says, ' If anybody should ask you, say you borrowed this before the action, if anybody should come and say this,' and I says to him ' No, I can't lie ' * * * He says ' I kept this money out and I should give it to you.' So he says ' It is just as good now as before,' and he give it to me."

Respondent produced a check for $250 which is indorsed by Mrs. White. He testified the check was delivered by him to an employee for delivery to Mrs. White. He was told that Mrs. White wanted cash and he then " OK'd " the check for cash. He did not authorize any one to deduct any amount nor did he have

any knowledge that any amount had been deducted from the money that was brought back after the check was cashed. It is urged that if any imposition was practiced upon Mrs. White, there is nothing whatever to indicate that the respondent was a party to, connived at, or condoned it. The payment of $110 to Mrs. White after her testimony at the ambulance chasing investigation is explained by respondent as follows: At the hearing before Mr. Justice WASSERVOGEL it was asserted that the order fixed respondent's compensation at $40. This was a mistake, as a certified copy of the order indicates that the fee was in reality $100. That Mrs. White became imbued with the idea that $110 was due her, called at respondent's office on a number of occasions after the open hearings, created disturbances and demanded the return of $110. The respondent assumed the statement that the allowance to him had been only $40 was correct; and after a search failed to produce the canceled vouchers, he assumed that in some inexplicable manner an error had been committed in his office, and he thereupon instructed his office to send $110 to Mrs. White. Respondent denies that any improper suggestion was ever made to Mrs. White with his sanction or authority.

Valentine Mihelitsch testified that his son Wallace was hurt in an automobile accident in August, 1926. Respondent was retained under an arrangement, as Mihelitsch testified, " We go half and half." Eventually the two actions brought, the infant's action and the parent's action, were settled; the infant's claim for one hundred dollars and the parent's for fifty dollars. The order allowing compromise in the infant's action fixed respondent's compensation at twenty-five dollars. The guardian should have received, therefore, seventy-five dollars. This, with the twenty-five dollars in the parent's action, totaled one hundred dollars, which should have been turned over to Mihelitsch. He testified he received seventy-five dollars in cash. His testimony is that he was asked whether he would prefer cash or a check, and when he answered cash, a check was given to him and he was told to indorse it, and he did so. Somebody in respondent's office went out and got the cash and gave him seventy-five dollars. Respondent produced a check for one hundred dollars indorsed by Mihelitsch, and urges that he had no part in the reduction, nor was he aware of it prior to these proceedings.

The referee found that the charges of withholding moneys have been proven in the Nulty, De Benedetto, Chalupsky, Kenny, White and Mihelitsch cases. He concluded that the testimony of respondent in support of the Nulty and De Benedetto loans does not ring true; that the payment to Mrs. Chalupsky was made

after the hearings before Mr. Justice WASSERVOGEL and was given as hush money; that the Fehrenbach (Kenny) and White payments are incidents in a clumsy scheme to cover up his tracks, and that the so-called loans in the Nulty, De Benedetto and Chalupsky cases are merely a part thereof. These conclusions of the referee are justified.

The record establishes beyond a doubt that it was respondent's practice to disregard court orders fixing his compensation in infants' cases and to exact payment in accordance with his retainer. The record further establishes that following the disclosures in the ambulance chasing investigation as to this unlawful practice, respondent authorized an effort to silence those who had given testimony in regard thereto.

Respondent concedes that in many instances orders allowing compromise of infants' claims were obtained in which no provision was made for compensation. In *Matter of Goldberg* (227 App. Div. 502) we expressed our views as to the former practice of certain Municipal Court judges signing compromise orders and refusing to fix attorneys' compensation. This practice has now been changed for some time and the law is being complied with.

However, it appears that knowledge of the fact that he could obtain orders allowing compromise in the Municipal Court led respondent to discontinue actions which he had commenced in the Supreme Court, where his compensation would be fixed, and to institute new actions in the Municipal Court. In doing so he did not hesitate to submit false affidavits. In the case of Dieco Arena, an infant, by Salvatore Arena, his guardian *ad litem*, against Louis Serin, respondent obtained an order discontinuing the action in the Supreme Court upon an affidavit verified by him dated the 9th day of October, 1925, in which he stated that although the injuries to the infant plaintiff were at first thought to be serious, they later proved to be slight. He continued: " That your deponent has informed the plaintiff that in the Supreme Court this case will take two years before it will be reached for trial on the calendar but the plaintiff is anxious to avoid this delay and bring the same in the Municipal Court where he can obtain a quick trial."

On the date when this affidavit was verified a settlement had already been agreed upon with the insurance company, the parent and guardian *ad litem* had executed releases, and two days prior thereto application had been made in the Municipal Court for the appointment of a guardian *ad litem*. The summons and notice of appearance are dated — October, 1925, the date being left blank. The affidavit of the guardian *ad litem*, upon which the

order of compromise was obtained in the Municipal Court, is verified the ninth day of October and states that "deponent's attorney had entered into negotiations with the attorney for the defendant in an effort to settle this claim, and defendant now offers the sum of $150." The bond of the guardian in the infant's case is dated October eighth and verified October ninth. The order allowing compromise in the Municipal Court contained no provision fixing respondent's compensation.

The same procedure was followed in the case of Pauline Wagner, an infant, by John Wagner, her guardian *ad litem*, against Michael C. O'Brien.

Respondent now urges that insurance companies were resentful against cases for exaggerated amounts, necessitating proportionate reserves, and he found in negotiating with an adjuster that while the adjuster might be willing to recommend a figure, he would advance the suggestion that in order to get his superior's formal approval the action must be instituted in the Municipal Court. In the Arena case, respondent testified that he was told by the representative of the company to put that through the Municipal Court and he would try to get $250; that he said: "I think I can prevail upon my superiors to pay you $250. Do not put the papers through until I tell you it is O. K." The steps taken by respondent, however, clearly indicate that the settlement had been agreed upon before the discontinuance of the Supreme Court action. It does not appear that the accompanying parents' action in the Supreme Court was discontinued at the time the discontinuance of the infant's action was obtained. The record also discloses that in many of the cases reviewed in this proceeding the insurance companies settled with respondent without asking to have the cases transferred from the Supreme Court to the Municipal Court. There was nothing to prevent respondent carrying through the settlement of all these cases in the Supreme Court where they were originally instituted. The only reason for his doing what he did would seem to be his desire to avoid having his compensation fixed, so that he might compel his clients to adhere strictly to the terms of the retainer.

The record further discloses that frequently in applications for leave to compromise, in his supporting affidavit respondent would state: "That the defendant offered to compromise the parent's claim for the sum of [naming the figure] of which deponent's fee is one-third." This was done in the Nulty, Kenny, Mihelitsch, Chalupsky and White cases, except that in the Chalupsky case he stated that his fee was forty per cent instead of one-third. His retainer in each case was fifty per cent, and the actual division of

the amount received on the settlement was on the basis of the retainer. Respondent explains this situation by saying that he left it to his office force to prepare the affidavits, and the mistake may be due to the fact that a great many of the infants' cases were accepted on a one-third retainer. After reviewing the testimony concerning these affidavits, the referee concluded: "That the respondent designedly and knowingly made the false statements." This conclusion is justified, and the inference is warranted that the motive for these false statements was the hope of respondent to persuade the court to allow him an equal percentage in the infants' cases by understating his percentage in the parents' cases. To carry out this plan he had the guardian ask for leave to compromise at the figure named, and to pay the attorney (respondent) one-third. The referee found that in many instances respondent had added, after the affidavit was verified by the guardian *ad litem*, the recital with reference to leave to pay respondent one-third.

The referee also found that respondent did not hesitate to make false statements in his affidavit submitted in support of the guardian's application for leave to compromise, in reference to his examination of the witnesses and the extent of the injuries sustained.

The referee found that the specific charges of misconduct have been established not only by a preponderance of evidence, but beyond a reasonable doubt, and, speaking of the respondent, he said: "I regret that I cannot find any extenuating circumstances in the conduct of the respondent. He did not act or testify upon the hearing like an innocent man. He was shifty and lacking in candor."

The record demonstrates that respondent lacks the fundamental idea of his profession. He has treated it solely as a business and one of a disreputable character. He was completely indifferent to the methods by which retainers were brought to him; and after he obtained the retainers, he dealt with his clients so far as the percentage provided for in the retainers was concerned in complete disregard of court orders fixing his compensation, and to avoid having his compensation fixed in other instances he did not hesitate to make false sworn statements to the court in order to accomplish the end sought. When the Ambulance Chasing Investigation disclosed his unprofessional conduct, he sought to buy the silence and false testimony that might help him.

Respondent is absolutely unfit to remain in practice as an attorney and should be disbarred.

MERRELL, FINCH, McAVOY and O'MALLEY, JJ., concur.

Respondent disbarred.